Would you call the first case? Only case? All right. Would the two lawyers who are going to argue each please stand and tell us your names? He's by your last name? Okay. As you both know, you have 20 minutes. You do not need to use it all. Would you like to reserve any part of that time, Ms. Heim, for rebuttal? I'm fine. Okay. And keep your voices up. This microphone records, but it does not amplify. Thank you. Ms. Heim, whenever you're ready and you may have a seat. May it please the court. Counsel. My name is Maggie Heim and I'm here to represent Mr. Stephen Spain. This is his direct appeal following a stipulated bench trial. Mr. Spain was found guilty of one count of aggravated and lawful use of a weapon for having a firearm in public without a concealed carry license. Now, in the lower court, Mr. Spain challenged his arrest on the grounds that the officer stopped and arrested him without any reason to believe that he was committing a crime. The question presented before this court is now that it is illegal to carry a gun for self-defense, when is it okay for the police to stop, question, and arrest someone on the belief that they have a gun in their waistband? Let me just clarify something with you, because it seemed like below the focus was primarily on probable cause to arrest, and on appeal it's been primarily on reasonable suspicion to stop, which I think we all understand are two different standards. It seems to me that in order to seize the gun, which is really the issue here, the state needed both, but I just want to clarify, are you arguing an absence of both of those things and that the absence of either of those things would require reversal here? Yeah, we're arguing that the absence of either would require reversal, and in the trial court there was reasonable suspicion and probable cause pushed at the motion to suppress, and then in the motion to reconsider there was a focus specifically on Holmes and just the probable cause element. We are arguing both of those. We focus on reasonable suspicion in part because it's a lower standard than the probable cause standard, and it wasn't even met in this case. So here the facts are for the most part agreed. We have no quibble with what O'Connor testified to. So the police drove up 718 48th Street on a January afternoon. They were responding to a call that a Hispanic man with facial tattoos had a gun. They drove up in an unmarked car and saw Mr. Spain, a white man with five Hispanic men, and from the car O'Connor saw from about 10 feet away that Mr. Spain turned away and seemingly pushed what he thought was the handle of the gun further into his waistband. O'Connor then got out, went up to Mr. Spain, and told him to put his hands in the air. Mr. Spain did this. He did put his hands in the air, but then he began to lower them, and Mr. Spain directed him to get them back up and put them on the hood of the neighboring car, and at that point the pat-down led to the discovery of the gun, and Mr. Spain was arrested without any question as to his licensing. So is it your position that if the police see somebody with what appears to be a gun, and there appears to be some action by that person to hide the gun, that's not enough for the police to make an investigative stop? That is our position, that now that concealed carry, which includes partially concealed if your shirt is moved or something so that it's showing somewhat, is now legal. So not only police know if you have a concealed carry license or a point card. So this stop could be in order to determine whether you have a concealed carry and a point card, correct? Right, right. So the question is to what extent can the police stop someone who they believe may be illegally holding a gun and have the licensing? It seems to me, Mrs. Hime, that the trial judge on the motion to reconsider made such a big deal out of the fact that the defendant was attempting, allegedly attempting to hide the gun. And my response to that is that if it's supposed to be concealed, then you're attempting to do what you're supposed to be doing. Right. And I don't know, it seems to me that the trial judge used that as a basis to say that, therefore, there was reasonable suspicion. Right, right. And I think that's the reality is that having a gun in your waistband, if it's briefly visible, it's not a problem. And then going to more fully conceal it. That seems to be what so many people are missing in this case. Right. I think that's a really important issue. Right. And it's something that was referenced in People v. Thomas, another First District case that came out with very different facts where the person ran from the police and threw the gun. But they noted that seeing a gun in a waistband or seeing, you know, is no longer going to be grounds to stop that person because you need something specific to that person that's telling you they're having it as illegal before you can go stop them and force them to interact with the power of the state. And that's the real question here. Because if the police simply wanted to approach someone and ask in a consensual encounter, this would be a very different situation. The question here is when can the police force someone to stop and interact with them? Is just seeing a gun enough or should they have let Mr. Stain, when he was turning away towards the fence, go about his way? And I also think it's important to reference the fact that the state has noted these cases where someone may engage in headlong flight upon seeing the police. And the courts have referenced that in combination with something else can be evidence that there's something illegal going on. But that's not what we have in this case. And at the moment that O'Connor saw Mr. Stain through the window adjusting the gun in his waistband, there was no sign that he even knew this was a police car coming up. All he knew was that an unknown car that was not marked with three men in it was approaching. So when that happened... Well, they were... Once they got out of the car, it was pretty easy to identify them as police officers. Right. But those observations of him turning away were before they were out of the car. Now, once they were out of the car, and this is a part of the question of when exactly did the stop occur, they are fully geared up. I think O'Connor had his gun, two magazines, two handcuffs, his vest. So it was very clear at that point that they're police officers. So then the question becomes, when exactly is O'Connor trying to effectuate this stop? And a stop can be done through a show of force, which includes, you know, the use of language and a tone indicating that compliance might be compelled. And I think here we have that where O'Connor gets out is clearly the police, goes directly to O'Connor and says, put your hands in the air. Put your hands in the air. It's the quintessential, you need to surrender to me right now and do what I'm telling you to do. And that's exactly what Mr. Spain did. And this is a very different tenor from going up and saying, how are you guys doing? Just try and keep your hands where I can see them while I ask you a few questions. This, from the start, was a command. And we can look at what Mr. Spain did to further elucidate that. Does the danger element ever have any factor at all when they were coming to the scene, there was some talk about that there was a dangerous situation brewing. Right. And I know the wrong guy had the wrong guy, clearly. But does that ever come into it? Do you just, just because you know they have a gun and you can't even say what's going on when it's a potentially dangerous situation? I think that's a really important question because danger always matters when we're asking police officers to go into these dangerous situations. And it's something that is considered in the Supreme Court cases, including Florida V.J.L., where the court asks the question of, should there be an exception to when you can approach someone if you believe they have a firearm? And the Supreme Court said, no, you still have to have that individuated suspicion before you force that person to interact with you. And I think the same is true here. And I also think in this case, not only do we have that anonymous phone call describing someone who is not Mr. Spain, but even the reference to the gang activity, which I think really persuaded the trial court, has a problem at the center of it, which is that it was coming from a confidential informant to someone else, and there was simply no information given at the suppression hearing on why this confidential informant was reliable. So this isn't a situation where the police were told this was going on. They said why they were relying on it, why they felt they had to go break up this group right now, why they thought Mr. Spain was a part of this group. Instead, you just have this sort of generalized suspicion that this is gang-infested territory, that someone presumably not trustworthy under the current civil law said there was going to be a shoot-up at some unknown time, but in this area, as a result, you can go stop anyone who is presumably exercising their Second Amendment rights, which is all the more important in a dangerous neighborhood. So I think the important thing in this case is recognizing, now that we recognize this important Second Amendment right, is to what extent is the Fourth Amendment going to still be available to people that want to exercise their Second Amendment rights? And I think the answer is that the Fourth Amendment is still there to protect them like everyone else, and the law that we already have is the law that we should apply, which is that if you want to stop them, you just need individualized suspicion, and here the police just didn't get that. They had this general information about a gang shoot-up, but they didn't tell us why they were believing the confidential informant. We don't even know if it was O'Connor, C.I., or if we'd ever worked with him before, or if anyone had worked with him before, and we don't have any information from O'Connor, the gang expert, that Mr. Spain was wearing anything, had clothes, or was doing anything that indicated that he was part of the gang in any way, or that this group was in any way part of a gang, just that there was a group of men on the yard in a dangerous part of the city. I think, was there any testimony that I recall, and you probably recall better, from the officer as to Mr. Spain's conduct after the officer got out of the car? Yeah, so the officer said that he got out of the car and told Mr. Spain to raise his hands. Mr. Spain did, but then he began to lower them towards his pocket, and the officer's testimony... So the officer, as soon as she got out of the car, said, raise your hands? Right. Officer O'Connor says that he walked up to within one or two feet, and Mr. Spain told him to put his hands in the air. Okay, so in that walking up, does he observe any conduct? No, there are no observations. He's clear that the observations he had were from the car window. So he does have observations after he gives that order and begins that interaction. Do the hands keep going up and down? Well, he just says that they... It's not clear to me that it's up and down, although we do have cases where there is someone that keeps wanting to put their hands in and out of their pockets, and even that wasn't reasonable suspicion, particularly in January in Chicago, as we know it gets horribly cold. But here, he does note that the defendant seemed nervous, and that Mr. Spain was increasingly nervous as this interaction went on. In the Croft examination here, I'm saying, oh, he was nervous. He was very nervous. But the problem is, being nervous when you're forced to interact with a police officer is not indicative of criminal behavior. It applies to many of us.  It applies to many of us. It applies to many of us. Yes, because you're nervous. Right. You get pulled over the car, you're nervous. I'm nervous here right now. Don't be. This is not where you go. No, I'm not. I don't consent to answering that. But, right, so this is one of those things where the cases that have found reactions to officers to push towards reasonable suspicion are ones where you have the defendant doing far more loony behavior. I think in one, the defendant was gesturing and ignoring the police officer. In Gomez, which I think was a pretty close case, the defendant, the driver in the car, lied about lying in the neighborhood. They'd been circling the neighborhood, and the defendant kept covering his waistband, got out of the car, seemingly did a bow to the car. In this, we have Mr. Spain seeming nervous when the police approached him, continuing to seem nervous when they told him to go put his hands on the car. And then that was it. They took him to the station house. They didn't even bother to ask, do you have a license for this? Just getting to that point, though, and I guess it goes to the second part to probable cause, are you saying that if they don't ask whether you can legally have a court comment, that they can't arrest the person? Is that your position? Is it like a bright line? It's just that easy? You either ask or you don't, and that's it. So I don't think it will always be that simple, because if a police officer saw someone doing something illegal with a gun, it doesn't matter if you have a Floyd card. So in that situation, you know what I mean? So if someone is brandishing a gun and a police officer sees it or has a tip that someone was brandishing a gun to get money from the corner shop, that's a totally different scenario. You don't need to ask about it. Like a son cut off in traffic? Also to open a gun, right? Right. So this is specifically the importance of asking, and what happened in this case, it really is because of how little the officers had to indicate that that gun in the waistband was illegally carried. That's the problem here is we don't have any tips indicating that it was going to be used illegally by Mr. Spain, that anyone was concerned about Mr. Spain having a gun, no information about whether he had it illegally because he was a felon. There was nothing like that. It's simply that they saw someone who had a gun in the waistband, and they knew it was a dangerous neighborhood. And they had a specific tip as to something that was going to occur right there, right where they found you. Are you saying that is completely irrelevant? I'm saying if they wanted to rely on that, they, in the very first case, needed to have someone testify about why that confidential informant was reliable. But even if you had that in this case, I think you're still not applying it to Mr. Spain because then everyone who lives in the neighborhood where there's any kind of gun. Anyone who's standing there with six guys, with five other guys, who happens to be observed with a gun, it fits kind of neatly with the tip. That's all. And we're only talking about reasonable suspicion. Right. And I mean, again, the confidential informant, I don't think they can rely on the tip where they didn't give any information on why it was reliable. But I also think here you have information. When you're saying they can't rely on it, are you saying it's completely irrelevant? It can't go into the reasonable suspicion determination. Is that what you're saying? I'm saying it needs. And you have a case that says that? Yes. That says we can't do. You can reference the fact that it was there, but I think where it wasn't corroborated, the fact that this, all you have is the fact that this was gang territory. But even if we include that this was gang territory and they expected something in this location, I don't think it's a situation where an officer of safety alert and a specific tip that a Hispanic man with facial tattoos has a gun is enough to stop every person, no matter the description, that you can see is carrying on that block. Because I think then you're making your Fourth Amendment rights depend on what neighborhoods you live in. Because any time there's an officer of safety alert, that block doesn't get their Second Amendment and their Fourth Amendment rights. They have to decide which one they want. So the importance still is individuating that suspicion to the people that you're stopping. And here that just wasn't done. And I think a part of the problem may just be that the state and the court were so used to having simply seeing a gun and being concerned for officer safety be enough, but the landscape is different now that there is the Second Amendment right and the specific recognition of how important that right is in dangerous neighborhoods where you potentially are living among gangs. Even in dangerous neighborhoods you're not allowed to carry a gun without a FOID card and you can still carry a license. Right. In any neighborhood. Right. Right. In any neighborhood. But the question is, when can the police stop you and they see you carrying a firearm, can they just assume that you don't have a FOID card and force you to interact? Can they put a stop on the end of a block and stop everyone that comes by to ask, do you have a gun, do you have a FOID card? They can ask all they want. We're all in the middle of trying to figure out. I mean, that's a very good question. Yeah. Well, so I think the answer is, and I think if we look to even Florida VJL, you have these answers for everyone understands, I mean, not personally, but, you know, the police are doing a very dangerous job and we recognize that firearms make that job far more dangerous because things are immediate. But even in Florida VJL, when you get a phone call that there's someone standing at a bus stop and they have a firearm and you know it's an illegal firearm, that's not enough to just go stop that person and force them to engage with you. There is not a firearm exception to the Fourth Amendment. And I think that's still going to be true today as it was back when Florida VJL was decided. So the important thing here is that it doesn't mean that the police have no tools at their disposal. Terry is a very flexible standard, but you still have to meet those standards of individuating your suspicion. And when you're relying on third-party information, like this allegation of a game shoot-up coming in that neighborhood, you need to know why you're relying on that information so that it's not just someone trying to disturb a group that they don't like and know we're going to hang out in that neighborhood. So again, here the state doesn't have any evidence of the reliability of the tips that they're relying on. The tips weren't specific to Mr. Spain. We have this tension now between the U.S. and the Supreme Court recognizing that we do have the Second Amendment right as citizens and that that right is perhaps most precious to people living in dangerous neighborhoods. And I think it makes no sense to say that someone who is exercising their Second Amendment right thereby has to give up some of their Fourth Amendment rights and be subject to indiscriminate seizures anytime the police are frightened. It's going to be a more narrow, more nuanced standard than that. And I think Terry gives us that, and the answer is individuated suspicion. But here we don't have that. Would it have been a problem if they had simply said, excuse me, do you have a concealed carry license? It would not have been a problem. Now if Mr. Spain turned around and said, I'm heading home, they needed to let him go. They needed to let him go. The problem here was requiring an interaction in the first place. Mr. Spain seemingly, when an unknown car drove up, wanted to walk away or at least turn away. But because O'Connor had seen the handle of the gun, that was enough for him to get out, Thomas or Spain to get his hands up, spread them on the hood of a car, and then arrest him and take him to the police station all before ever asking, do you have a license for that firearm? And I just believe that the Fourth Amendment provides more protection than that. And as a result, we're asking that this Court reverse this conviction. Are there any more questions? Thank you. Good afternoon, Your Honors. I'm Assistant Justice Attorney Benjamin Kabugi, and I'm representing the people of Illinois. In the matter in front of this Court, Your Honors, there was a valedictory stop. On the day of the issue, officers were aware of numerous things. One, there was an existing gang war in the area. Two, a valedictory stop that immediately turned into an arrest. But based on the circumstances, as the officers did have, one of the information that they had was an existing gang war. They also had the description of a Hispanic male with face tattoos in possession. It did not fit the description. No, it did not. It did not fit the description of the defendant. But even though the defendant did not match the description provided by the caller, it does not negate the fact that the officers were doing a job investigating a call of an individual with a gun. While they were responding to the call, there was an officer safety alert that was issued based on information received from a confidential informant. Now, counsel previously stated that there was no indication or any information provided during the trial as to the veracity of the information or anything like that. But the information that was given by the confidential informant was quite specific. It gave an address, which was the situs of a potential shooting. And then upon the officer's arrival, although the defendant did not match the description, the defendant immediately, at the presence of the officer's presence, turned to defense and hid the weapon in his pants. Do you agree with counsel for the defense that all of that conduct occurred when the officer was still in the car and that there was no observations by the officer once he got out of the car? Do you agree with that? The observation, yes, I do agree that the initial observation was from the car. However, that still does not negate the fact that the officer did see what he believed to be the butt of a weapon. And at that time, he... And some conduct in hiding that. Exactly. But shouldn't that lead to what Justice Bickford has suggested several times here? That should lead to questions, not to an immediate arrest. Is that correct? That is correct. So the officer made a mistake in this case, correct? It's not a hard question. I want to be clear. The state is not indicating that or suggesting that officers should not inquire whether a person has a valid hood or a CCL license. However, in this situation, it was not a requirement for the officers to eliminate every legal justification as to the feminist possession of a weapon. The purpose of a terrorist act is to investigate, to ask questions, to inquire. That's not what happened here. What happened here is there was an immediate arrest. So in this case, the officer simply made a mistake. It appears to me that the trial judge awarded the officer for making that mistake, which it's my understanding of the whole thing, why we have the whole fruits of the poisonous tree and why we simply don't allow the evidence in. It's a way of punishing the police for making those mistakes. The United States Supreme Court has said that a few times. Correct? Correct. Okay. So in this case, the officer made a mistake. And the officer, the punishment to the officer, no, they don't get sued. They don't get fined. They just lose the evidence. That's been the punishment since, for some time now. Since before I was born. Although the officer did not make any inquiries as to the defendant's possession of a weapon, his conduct at the time, and based on the information the officers had, which was the existence of a gang war, as well as an officer safety alert, issue of an address. You're changing the subject. Why don't you get back on point then? Because you're changing the subject. You haven't answered my question right now. So go ahead. You can get back to your script. To answer your question, yes, the officers, in this case, did make a mistake. I'm not asking to inquire whether the defendant had a valid Ford card. Well, as to their presence at the scene, they were in potentially a very vulnerable position. It was three officers. They arrived at the scene with the information that they had at hand, and they encountered five individuals, one of whom was a defendant who has a readily accessible weapon. Now, the presence of a weapon does create a safety concern in this situation, especially in the circumstances before this court, because you have a defendant who is located next to an address that is the site of a potential shooting. And upon the officer's arrival, you have the defendant making movements of, let's be honest, hiding the gun in his pants. So at that time, and it was reasonable for him, especially with, as I said earlier, the information that they had to conduct a safety protective pat-down of the defendant. Okay. So going back to Justice Walker's point, what more did the officer have at the point of arrest than he had at the point of the terrorist attack? What more did he have? What additional information, if any, did he have? Other than what he had at his disposal, the totality of circumstances. But it's the same totality. It's the same totality. He did not have any, at that time, he did not have any additional information to. Whereas if he had asked for the FOIA card and the CCL license, which the defendant would have been required to show him. Yes. He would have had more. Yes. If those weren't produced, correct? Yes. But in this case, what you have at point A is exactly what you have at point B. At point B. Okay. And I just. . . And you're saying it was enough for point A and it was enough for point B. That is correct. That is correct. And as to the probable cause, the officers had probable cause to make the arrest. As I stated earlier, by no means is the state suggesting that officers should not first inquire whether or not a person has a valid FOIA or CCL license. However, in the circumstances before this court, you have a defendant who is making suspicious, evasive movements in possession of a weapon right next door to an address that is the site of a potential shooting. Now, essentially what the defense is trying to do is have a per se argument or a per se rule where if an officer does not initially inquire whether a person has a valid FOIA card or CCL, anything discovered after that is illegal. However, in this case before this court, the absence of that inquiry is not detrimental to this court's analysis because based on the circumstances, based on circumstances in this case, it was reasonable. The officers believe that the defendant was not validly or legally possessing that weapon because a reasonable amount of evidence suggests that the defendant did not have a valid FOIA card or CCL license. Now, if the defendant did not have a valid FOIA card or CCL license, then it is possible that the defendant did not have a valid FOIA card or CCL license. So the defense is trying to make a case of officers hiding the gun in his pants. So what's wrong with fixing it? Even if there's no police officers around, you may just suggest yourself so that you're not whatever it is that's supposed to be concealed is actually concealed so that you're abiding by the law. So that should not be, and that's what the trial judge used as a basis on the motion to reconsider, to reconsider and go the other way in this case. Your Honor, this is not a situation where the defendant just was fixing his shirt to, you know, to properly, I guess, carry the weapon. This was an overt act of hiding that weapon at the presence of police officers. This was just, it was not an individual. I didn't even know they were police officers at that point. When he's first adjusting the gun, the police are still in the car, in an unmarked car, correct? That is correct. However, at their time when they exited the vehicle, they, although they were unmarked, closed, they did have the police insignia on their chest. And at that time, they, you know, he had knowledge that they were police officers. Now, I do want some touch on the subject. The defendant was just not, just a random individual walking down the street, and then the officers stopped him for, when they saw the weapon. This was an individual who was located next to the site of a potential shooting. They... Was there evidence, I can't remember, independent evidence, other than the tip, that this house actually belonged to a gang leader, a rival, a gang leader? Or was it that, was that all from the confidential? At this time, I do not have any information whether, the officers at the time had information on whether it was the house of a potential gang leader. However, I mean, based on the confidential informant's tip, it was very specific. It provided an address, and then you have an individual, although it did not match the description provided by the caller, is making evasive movements in an attempt to hide a gun at the presence of officers. If there are no further questions. Well, just, you know, in your brief, you talk about that a reasonable person would inform the officers they had a license to carry the gun, but there's no obligation to do that. There's no obligation. You're right, there's no obligation. And again, even the failure of the officers to ask whether the individual was carrying, or legally carrying a weapon, again, is not detrimental to the analysis before this court, because the totalitarian circumstances show that based on the defendant's conduct, it was indicative of illegal gun ownership. A reasonable gun owner would not hide a weapon at the sight of police officers. If I recall from the record, coming back to Justice Griffin's question, that was also another basis that the judge used at the motion to reconsider, that the fact that he didn't voluntarily state whether or not he had a concealed carry license. And I may be wrong about that, but I thought I remember seeing that. And if that's the case, that's not the standard, as you just, Justice Griffin just asked and you just answered. So it seems like to me the trial judge heard it as well. Is that, did I read that? Maybe I'll ask the other side. I thought I read that, that that was one of the basis that the trial judge used. At this time, Your Honor, I'm not sure. Okay. I'm not exactly sure. That's fine. Maybe the other side remembers. You weren't present, obviously. I was not present, Your Honor. So he's not. And based on that, based on the argument presented today for this court, and based on the arguments presented in the state's brief, we ask this court to affirm the defendant's conviction. Thank you. Thank you. You can. I think she knows that you have a question for her. Yes. Do you know the answer to the question? Wasn't that one of the basis that the trial judge used? Right. So in other words, the trial judge heard it as well. Yeah. Because that's the basis that nobody's required to say, to answer any questions until the questions are asked. Right. Right. And once questions are asked, you have to answer. Right. Right. So that's the thing. Because I actually do think the trial court made two really clean errors here, which is that he actually said that a Terry stop could be had as soon as the officer saw that the person had a firearm in their waistband. That was it. And then the fact that they didn't volunteer that it was licensed was enough for probable cause. And I think on both points the court is wrong there. You cannot have a Terry stop simply based on the fact that someone is exercising their presumably constitutional right. Otherwise, you do have citizens making this calculus of which one do I want to exercise. And I don't think the Constitution requires that. And I don't think Terry requires that. Whether the court said that or not, though, that isn't the case here. It's the totality of the circumstances. Right. Terry stop. So, I mean, whether it's not based. So you all can look at everything that's in the record, but I think you'll find that the record here is lacking because you do have simply the fact that he turned away and was stepping up further in his waistband as an unknown car approached. And we have the case decided where defendant or, you know, suspects turn away and don't want to engage with the police, even when they're rolling up in a marked car, let alone an unmarked car. And as Justice Walker keeps noting, it is a concealed carry law that allows for some partially concealed, but it makes perfect sense. If you have someone you don't know coming up, you might want to make sure to adjust yourself so that you're not out here accidentally freaking someone out. And, again, I just want to point out that the state really has to focus hard on this gang warfare tip. And, Justice Nickla, you asked whether the fact that 720 West 418th was a gang household was corroborated. And it wasn't. That all came from the tipster. The fact that it was going to be in that location, there wasn't a specific timeline given to the tip. It was just that at that location, a confidential informant told someone else that there was going to be a shooting because one of the gang leaders lived in that house. So they might have been able to corroborate whether a gang leader, in fact, did live in the house. And they didn't do that. And they didn't show why the confidential informant was reliable because of his past practice with the police officers. So this is one where all you have is this sort of coming out of the ether reference to a confidential informant. And we have people at East Sanders in our brief that collects a lot of cases talking about what the standard is if you're going to rely on a confidential informant. And there has to be some corroboration specifically of criminality. And I think seeing a group of men standing in the yard of the next-door house is not enough to corroborate that. And it's certainly not enough to say that Mr. Spain is now somehow a man with facial tattoos that's about to shoot up the house next door. All you have is that Mr. Spain is standing in a yard next door, a confidential informant who's totally uncorroborated, and the fact that Mr. Spain is presumably exercising his Second Amendment rights. And then we get to the fact that even after doing this stop, the state has now recognized that it was not appropriate to arrest him without asking those questions. And I think that's all there needs to be. That's not a probable cause. I don't think you can get to reasonable suspicion to force Mr. Spain to engage with you at all, but you certainly can't take him to the station house to look up his licensing requirements before even trying to ask because, again, under the license, you have to respond. So, again, I think this is a situation that is exactly what the 1st District referenced in People v. Thomas when they said this is not going to be a state where you can arrest first and check licensing later. There needs to be more than that. And I think this is simply a case where the officers and the trial court got it wrong because that is basically what happened. And the fact that Mr. Spain looked nervous when he complied, the fact that he turned away with an unknown car approach, that doesn't give any information on criminality because at the end of the day, Mr. Spain nervously complied with police officers, and he was taken to the police station without ever being asked if he was legally exercising his Second Amendment rights. Are there no further questions? Any questions? Thank you both. As usual, very good job on both sides, and we will take this matter under advisement. And we are in recess. Thank you.